1  BRIAN S. KABATECK, SBN 152054
    (bsk@kbklawyers.com)
2  RICHARD L. KELLNER, SBN 171416
    (rlk@kbklawyers.com)
3  REZA SUBA, SBN 250428
    (rs@knklawyers.com)
4  KABATECK BROWN KELLNER LLP
   644 South Figueroa Street
5  Los Angeles, California 90017
   Telephone: (213) 217-5000
6  Facsimile: (213) 217-5010

7  Attorneys for Plaintiff
   and the Proposed Class
8

9               UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                  (SAN FRANCISCO DIVISION)

12

| | |
|---|---|
| 13  GOLDENE SOMERVILLE, on behalf of himself and all others similarly situated, | Case No: 08-cv-02443 JSW |
| 14 | |
| 15       Plaintiff, | HON. JEFFREY S. WHITE |
| 16       vs. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| 17  STRYKER ORTHOPAEDICS (aka STRYKER ORTHOPEDICS; aka STRYKER ORTHOPEDICS, INC.); HOWMEDICA OSTEONICS CORPORATION; STRYKER CORPORATION; and STRYKER SALES CORPORATION, | |
| 18 | |
| 19 | Date: September 26, 2008 |
| 20 | Time: 9:00 a.m. Ctrm: 2, 17th Floor |
| 21       Defendants. | |

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................... 1

II.  SUMMARY OF THE COMPLAINT ........................................................ 2

    A.  Stryker Is One of the Five Largest Manufacturers that Dominate the Market for Hip and Knee Implant Products. .......................................... 2

    B.  A Federal Investigation Found that Stryker Had Paid Many Millions of Dollars in Disguised Kickbacks to Orthopedic Surgeons to Artificially Inflate the Sales of Its Hip and Knee Implant Products. ......................... 2

    C.  Stryker's Pervasive Kickback Schemes Artificially Increased the Prices as Well as Sales Volume of Its Hip and Knee Implant Products. ............................................................................................... 4

    D.  The Stryker Kickback Schemes Raised Costs Not Only for Public Health Care Programs, But Also for Private Sector Patients, Including Plaintiff. ................................................................................. 4

III. LEGAL STANDARD:  THE ALLEGATIONS IN THE COMPLAINT, AND ALL REASONABLE INFERENCES, MUST BE ACCEPTED AS TRUE... 5

IV.  THE COMPLAINT ALLEGES SUFFICIENT FACTS TO STATE A CARTWRIGHT ACT CLAIM AGAINST DEFENDANTS FOR THEIR UNLAWFUL KICKBACK CONSPIRACY WITH SURGEONS ................. 6

    A.  Stryker Formed and Operated an Illegal Kickback Conspiracy With Orthopedic Surgeons. ............................................................................ 6

    B.  Plaintiff's Cartwright Act Claim Is Based on Stryker's Vertical Conspiracies with Surgeons. ................................................................. 8

V.  THE COMPLAINT SUFFICIENTLY ALLEGES A VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 ....................... 9

    A.  The Complaint Alleges that Plaintiff Suffered Injury In Fact. ............. 9

B.     Plaintiff and the Class Are Entitled to Restitution of the Extra Sums They Paid for Stryker Products Due to Stryker's Illegal Kickback Conspiracy..................................................................................................11

C.     Plaintiff and the Class Are Entitled to Injunctive Relief Benefiting Private-Pay Patients.......................................................................................11

VI.    THE COMPLAINT SUFFICIENTLY ALLEGES PLAINTIFF'S MEMBERSHIP IN THE CLASS..................................................................................12

VII.   CONCLUSION.........................................................................................................13

Kabateck Brown Kellner, LLP
644 S. Figueroa Street
Los Angeles, California 90017
(213) 217-5000
FAX (213) 217-5010

# TABLE OF AUTHORITIES

**Cases**

*Balistreri v. Pacifica Police Dept.*,
   901 F.2d 696 (9th Cir. 1988) ...................................................................................6

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal.4th 163 (1999) ...........................................................................................10

*Chicago Title Ins. Co. v. Great Western Financial Corp.*,
   69 Cal. 2d 305 (1968) .............................................................................................7

*In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
   102 F.3d 1524 (9th Cir. 1996) .................................................................................6

*Jenkins v. McKeithen*,
   395 U.S. 411 (1969) ..............................................................................................14

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal.4th 1134 (2003) .........................................................................................10

*Pareto v. F.D.I.C.*,
   139 F.3d 696 (9th Cir. 1998) ...................................................................................6

*Parks Sch. of Bus., Inc. v. Symington*,
   51 F.3d 1480 (9th Cir. 1995) ...................................................................................6

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ...................................................................................6

*State Farm Fire & Casualty Co. v. Superior Court,*
   45 Cal.App.4th 1093 (1996) ..................................................................................10

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
   17 Cal.4th 553 (1998) ...........................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S.Ct. 2499 (2007) ...........................................................................................13

*United States v. City of Redwood City*,
   640 F.2d 963 (9th Cir. 1981) ...................................................................................6

iii

**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

**Statutes**

Fed. R. Civ.P. 12 ..................................................................................................................6

Cal. Bus. & Prof. Code § 17200 ........................................................................*passim*

Kabateck Brown Kellner, LLP
644 S. Figueroa Street
Los Angeles, California 90017
(213) 217-5000
FAX (213) 217-5010

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Largely ignoring the allegations in the complaint, Defendants Stryker Orthopaedics, Howmedica Osteonics Corporation, Stryker Corporation, and Stryker Sales Corporation (collectively, "Defendants" or "Stryker") have moved to dismiss this class action on the following grounds:

- Plaintiff's Cartwright Act claims fails because the complaint does not allege facts that Stryker was part of a conspiracy;
- Plaintiff's section 17200 claim fails because Plaintiff has not alleged facts (a) showing in jury in fact or causation, (b) warranting restitution, or (c) warranting injunctive relief.

Defendants' motion is seriously deficient, however, because the complaint does allege exactly what Defendants mischaracterize as being absent from the complaint.

**The unlawful conspiracy with the surgeons**.  The complaint alleges vertical anticompetitive conspiracy—Defendants' had kickback agreements with orthopedic surgeons, which artificially inflated demand and prices for Stryker's hip and knee implant products.  The complaint alleges that the effects of the kickback schemes include artificially inflating costs to patients in the private sector who have Stryker products implanted during hip or knee surgery, both directly and by driving up health insurance premiums.

**The harm suffered by Plaintiff and the illegal profit reaped by Defendants**.  The complaint alleges that Plaintiff had hip replacement surgery in June 2003 (right hip) and May 2005 (left hip), in which one or more Stryker products were implanted or used.  Plaintiff paid over $1,500.00 dollars in *out-of-pocket* expenses for the surgeries.  The complaint sufficiently alleges that Plaintiff sustained this monetary out-of-pocket loss due to the Stryker defendants' unlawful business practices.

Kabateck Brown Kellner, LLP
644 S. Figueroa Street
Los Angeles, California 90017
(213) 217-5000
FAX (213) 217-5010

These allegations, which must be accepted as true, more than satisfy the elements of a Cartwright Act and 17200 claim. In this regard, Defendants' motion is somewhat confusing because it appears that either Defendants are betting that the Court will not look at the complaint, or that it will simply apply the wrong standard on this motion.

Accordingly, Defendants' motion should be denied in its entirety.

## II.     SUMMARY OF THE COMPLAINT

### A.     Stryker Is One of the Five Largest Manufacturers that Dominate the Market for Hip and Knee Implant Products.

As alleged in the complaint, the market for hip and knee implant products is "huge, highly lucrative, and tightly concentrated." (Complaint, ¶ 16.) In the United States, more than 700,000 hip and knee replacement surgeries are performed every year, and U.S. sales of orthopedic devices for hips and knees exceeded $5.1 billion in 2005 alone. (*Id.*)

Five companies, including Stryker, together control almost 95% of the market for hip and knee implants. (¶ 17.) Stryker alone accounts for approximately 20% of the market. (*Id.*) For 2007, Stryker reported gross worldwide profits of $4.135 billion on $6 billion in net sales, with orthopedic implants accounting for 60% of that sales figure. (¶ 18.)

### B.     A Federal Investigation Found that Stryker Had Paid Many Millions of Dollars in Disguised Kickbacks to Orthopedic Surgeons to Artificially Inflate the Sales of Its Hip and Knee Implant Products.

In September 2007, the U.S. Department of Justice and the federal Department of Health and Human Services ("HHS") announced that a federal investigation had confirmed that Stryker and the other four largest hip and knee implant manufacturers had engaged in a "massive pattern of 'financial inducements paid to surgeons to use their products' in hip and knee implant surgeries, in

— 2 —
**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

violation of several federal anti-kickback and false claim statutes." (¶ 20.) The federal government entered into settlements of criminal complaints and civil claims against four of the five companies, in exchange for settlement payments totaling $310 million and commitments to various reforms. (¶¶ 20, 24, 25.) However, because Stryker was the first of the big five hip/knee implant companies to cooperate with federal investigators, the federal government entered into a Non Prosecution Agreement with Stryker that held all federal claims against it in abeyance. (¶ 20.)

As detailed at pages 5-7 of the complaint – quoting congressional testimony about the investigation delivered by HHS's Assistant Inspector General for Legal Affairs, Gregory E. Demske – the kickback schemes took the form of consulting and product development agreements between Stryker (as well as the other four top manufacturers) and surgeons that actually "'involved minimal or no work being performed'" by the physicians. (¶ 21.) The federal investigation concluded that in these arrangements, Stryker, like the other four companies, "'derived little value beyond the acquisition of increased sales of artificial hip and knee implants.'" (*Id.*) There were many thousands of these "consulting agreements," and company payments ran into hundreds of millions of dollars from 2002 through 2006. (Id.) Stryker has recently published disclosures on its website acknowledging its millions of dollars to orthopedic surgeons throughout the United States, including California, during 2007 alone. (¶ 25.)

What Stryker, like the other companies, did receive in the way of benefits from the financial arrangements with surgeons was "pumped-up sales of their products." (¶ 22.) (See also ¶ 1: "a pervasive kickback scheme orchestrated by" Stryker used "phony consulting agreements with orthopedic surgeons to cleverly mask disguised kickbacks paid to doctors and/or hospitals in return for choosing which manufacturer's device to use during a patient's surgery," with the aim of increasing Stryker's market share.) HHS official Demske's congressional

— 3 —
**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

testimony, along with scholarly research he cited in his testimony, indicate that the kickback agreements "were effective in producing the unlawful result that the participating company desired" – i.e., artificially elevated sales. (¶ 23.)

### C. Stryker's Pervasive Kickback Schemes Artificially Increased the Prices as Well as Sales Volume of Its Hip and Knee Implant Products.

Stryker's unlawful kickback schemes with cooperating surgeons were effective in promoting demand for its hip and knee implant products, sustaining its dominance in the hip and knee implant market. (¶¶ 22, 23, 26.) In turn, Stryker's artificially enhanced sales and market dominance have "inflate[d] the prices of the hip and knee implant products" that it sells. (¶ 26.) (See also ¶ 45: the unlawful agreements between Stryker and surgeons "result[ed] in artificially high prices for Stryker hip and knee . . . implant devices and related products.")

### D. The Stryker Kickback Schemes Raised Costs Not Only for Public Health Care Programs, But Also for Private Sector Patients, Including Plaintiff.

The federal investigation and response were spurred by well-founded concern that inflated pricing of the hip and knee implant products sold by Stryker (as well as the other big four companies), attributable to the artificially inflated demand created by its kickback schemes with thousands of surgeons, was draining publicly funded health care programs like Medicare and Medicaid. (¶ 27.) However, the anticompetitive pricing effect of Stryker's kickback agreements is not limited to the public sector: as the complaint alleges, "private-pay patients are also harmed by Stryker's practices." (*Id.*)

The complaint identifies two ways in which private-sector patients – including both uninsured persons and persons whose health insurance includes a co-pay requirement – "are harmed financially" by Stryker's kickback schemes. (¶ 28.) First, the co-pays or other out-of-pocket expenses of private-pay patients implanted

— 4 —
**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

1 with Stryker hip or knee products are artificially elevated. (*Id.*) Second, the
2 premiums of patients with private health insurance are pushed higher over time due
3 to the artificially increased costs. (*Id.*)

4 The settlement reached between federal officials and Stryker do nothing to
5 remedy these financial harms to private-sector patients. (*Id.*) Moreover, Stryker's
6 Non Prosecution Agreement is limited by its terms to 18 months from its execution
7 (September 2007). (Exh. A to complaint, at 1.) Thus, the agreement will expire a
8 mere six months after the September 2008 hearing on Stryker's motion to dismiss.

9 As a result, as the complaint alleges, the Non Prosecution Agreement
10 provides no prospect of recovering restitution for private-pay patients in California
11 of amounts that Stryker's kickback schemes have caused them to pay during the
12 class period (¶ 29), as well as no assurance that any reforms will persist past April
13 2009.

14 One of the patients whose interests are not served by the Stryker Non
15 Prosecution Agreement is Plaintiff, a resident of Santa Cruz County. (¶¶ 7, 32.) She
16 underwent right hip replacement surgery in June 2003 and left hip replacement in
17 May 2005, during which times she was implanted with one or more Stryker
18 products. (¶ 32.) Her out-of pocket expenditures for her hip surgery amounted to
19 approximately $1,500 or more. (*Id.*)

**III. LEGAL STANDARD: THE ALLEGATIONS IN THE COMPLAINT, AND ALL REASONABLE INFERENCES, MUST BE ACCEPTED AS TRUE**

In considering a motion pursuant to Fed. R. Civ.P. 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving

Kabateck Brown Kellner, LLP
644 S. Figueroa Street
Los Angeles, California 90017
(213) 217-5000
FAX (213) 217-5010

— 5 —
**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

party. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).

Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996), *rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998).

For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6). *United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

## IV. THE COMPLAINT ALLEGES SUFFICIENT FACTS TO STATE A CARTWRIGHT ACT CLAIM AGAINST DEFENDANTS FOR THEIR UNLAWFUL KICKBACK CONSPIRACY WITH SURGEONS

The elements of a Cartwright Act claim are: (a) the formation and operation of a conspiracy; (b) illegal acts done pursuant to the conspiracy; (c) a purpose to restrain trade; and (d) damages caused by these acts. See *Chicago Title Ins. Co. v. Great Western Financial Corp.*, 69 Cal. 2d 305, 318 (1968). All of the elements have been pled in the complaint, such that a motion to dismiss is improper.

### A. Stryker Formed and Operated an Illegal Kickback Conspiracy With Orthopedic Surgeons.

In its first attempt to mislead the Court, Stryker argues that no claim of violation of the Cartwright Act can be predicated on allegations of conspiracy between an entity and its corporate affiliates. (Def. MP&A at 5:3- 10.) Where

— 6 —

**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

Stryker misses the mark, and badly at that, is that the conspiracy is between the Stryker defendants and the surgeons.

The complaint alleges that Stryker entered into thousands of disguised kickback agreements, worth many millions of dollars, with orthopedic surgeons around California and the United States for the purpose of artificially inflating demand for Stryker's hip and knee implant products. (Complaint, ¶¶ 1, 20-26.)

Stryker's reliance on *Chicago Title Insurance Co. v. great Wester Financial Corp., supra* -- for the proposition that Plaintiff fails to plead facts plausibly suggesting that Stryker was part of a conspiracy in violation of the Cartwright Act -- is misplaced. In *Chicago Title*, the court dismissed the action because plaintiff failed to do any of the following: "define the market by subject matter, total volume, proportion controlled by defendants, availability to appellants of the subject matter of competing subject matters, and availability to the public of the subject matter or a competing subject matter." The court reasoned, "Respondents are entitled to know what acts constitute the alleged violations so that the time and expense involved in conducting an investigation and pursuing discovery may be reasonably limited, for the complaint might otherwise be construed as a blanket license to indulge in interrogatories, depositions, and motions to produce ad infinitum, ad nauseam."

Here, on the other hand, Plaintiff has, at nauseam, explained in paragraphs 16-25 of the Complaint the description of the market, volume and proportion of the market. Unlike the "shotgun technique" employed by the plaintiffs in *Chicago Title* (where they attempted to explore at random and at enormous expense unrestrained and unverified allegations), Plaintiff alleges specific conduct in furtherance of a conspiracy, verified by congressional testimony.

More specifically, the complaint quotes at length from congressional testimony by HHS Assistant Inspector General Demske describing features of the illicit agreements between Stryker (as well as the other four manufacturers) and the

Kabateck Brown Kellner, LLP
644 S. Figueroa Street
Los Angeles, California 90017
(213) 217-5000
FAX (213) 217-5010

— 7 —

**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

participating surgeons and institutions. (Complaint, ¶ 21.) The complaint also alleges Stryker's purpose in entering into such covert agreements and the effectiveness of the agreements in driving up demand and pricing for Stryker's hip and knee implant prices. (¶¶ 1, 22-24, 26-28.)

Next, without any legal authority, Stryker suggests that the complaint is deficient because it does not name Plaintiff's surgeon. (See Def. MP&A at 3:14-15.) Stryker is mistaken, again. It is not necessary for Plaintiff's surgeon to have participated in an illegal kickback agreement with Stryker. The complaint, as explained above, alleges that because many surgeons did participate in such illegal agreements, market-wide demand for and pricing of Stryker's hip and knee implants were artificially elevated. (Complaint, ¶¶ 21-26.)

The complaint sufficiently alleges a Cartwright Act claim. Accordingly, Stryker's motion should be denied in its entirety.

**B.    Plaintiff's Cartwright Act Claim Is Based on Stryker's Vertical Conspiracies with Surgeons.**

Stryker's *Twombly*-based (*Bell Atlantic Corp v. Twombly*, 127 S. Ct. 1955 (2007)) argument that the complaint fails to plead the existence of horizontal conspiracy, "suggest[ing], at most, 'conscious parallelism' among competitors," is another red herring. (See Def. MP&A at 5:13-6:15, 8:3-12.)

The complaint alleges multiple vertical conspiracies, all involving Stryker on one side: the numerous disguised kickback agreements between Stryker and the surgeons and institutions that facilitated Stryker's effort to sustain its market dominance and drive up demand for and pricing of its hip and knee implant products. (See Complaint, ¶¶ 1, 16-17, 20-23, 25-26.)

Thus, once again, none of the authorities that Stryker cites are applicable to the complaint in this case. Accordingly, Stryker's motion to dismiss Plaintiff's Cartwright Act claim should be denied.

# V. THE COMPLAINT SUFFICIENTLY ALLEGES A VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200

Stryker argues that Plaintiff's claim under Section 17200 should be dismissed because: (1) the complaint fails to allege facts showing injury in fact or causation; (2) the complaint fails to allege facts warranting restitution; and (3) plaintiff is not entitled to the injunctive relief. The complaint, however, specifically alleges that Plaintiff suffered out-of-pocket damages in excess of $1,500 due to the illegal kickback scheme that Stryker employed. (¶ 32.) On this ground, Plaintiff is entitled to restitution of Stryker's ill-gotten profit and injunctive relief to prevent future harm.

## A. The Complaint Alleges that Plaintiff Suffered Injury In Fact.

Stryker argues that the complaint fails to allege that Plaintiff suffered financial harm that was attributable to wrongful business practices by Stryker. That is, Stryker contends that the complaint fails to allege that any of Plaintiff's out-of-pocket payments went specifically toward the Stryker products, that Stryker benefited in any respect, or that any portion of Plaintiff's expenditures "resulted from wrongdoing by anyone, much less by Stryker." (*Id*. at 9:13-19.) Stryker's arguments are without merit.

Stryker engaged in wrongful business practices. The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 . . . ." Therefore, an act or practice is "unfair competition" under the UCL if it is forbidden by law or, even if not specifically prohibited by law, is deemed an unfair act or practice. As the California Supreme Court stated in *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003), at page 1143:

> "Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices.

— 9 —

**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

> [Citation.] ***In addition, under section 17200, 'a practice may be deemed unfair even if not specifically proscribed by some other law.'*** [Citation.]" (Emphasis added.)

The remedies available under the UCL are "cumulative . . . to the remedies or penalties available under all other laws of this state." (§ 17205.) "[I]n enacting the UCL itself, and not by virtue of particular predicate statutes, . . . the Legislature has conferred upon private plaintiffs 'specific power' [citation] to prosecute unfair competition claims." *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* 17 Cal.4th 553, 562 (1998).[1]

As summarized in section IV, above, the complaint alleges that Stryker violated "several federal anti-kickback and false claim statutes," along with California's Cartwright Act and numerous other California and federal statutes, by entering into millions of dollars worth of unlawful kickback schemes with cooperating surgeons and institutions. (Complaint, ¶¶ 1, 20-23, 25, 54.) The complaint alleges further that these practices artificially inflated the prices of Stryker's hip and knee implant products. (¶¶ 22-23, 26-27.) It alleges that private-pay patients as well as the big public health care programs like Medicare and Medicaid have sustained higher costs in hip or knee replacement surgery as a result of ("attributable to") Stryker's illicit kickback schemes, and that private-pay patients also have experienced rising health care premiums due to the artificial and unlawful price-boosting by Stryker. (¶¶ 27-28.) It alleges that Plaintiff, who

---

[1] By "borrowing" violations of other laws, the UCL deems those violations "unfair competition" independently actionable under the UCL. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999). "Virtually any law-- federal, state or local--can serve as a predicate for a section 17200 action. [Citation.]" *State Farm Fire & Casualty Co. v. Superior Court* 45 Cal.App.4th 1093, 1102-1103 (1996), disapproved on another ground in *Cel-Tech*, at pp. 184-185. Therefore, a violation of a federal law or regulation "may serve as a predicate for a [UCL] action. [Citations.]" *Roskind v. Morgan Stanley Dean Witter & Co.*, *supra*, 80 Cal.App.4th at p. 352.

— 10 —

**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

1 underwent two hip replacement surgeries involving one or more Stryker implant
2 products, is one of the adversely affected private-pay patients. (¶ 32.)

3 The complaint alleges that Stryker benefited financially from the same
4 misconduct that harmed Plaintiff financially, by boosting its market share, pricing,
5 and sales. (¶¶ 1, 21-23, 26.)

6 Thus, Stryker's argument that the complaint fails to allege both injury in fact
7 and causation is baseless.

### B. Plaintiff and the Class Are Entitled to Restitution of the Extra Sums They Paid for Stryker Products Due to Stryker's Illegal Kickback Conspiracy.

11 As discussed above, the complaint sufficiently alleges that Plaintiff sustained
12 out-of-pocket expenses for her hip replacement surgeries that were higher than they
13 would have been had Stryker not engaged in unlawful practices that artificially
14 raised the prices of its hip and knee implant products. The alleged price increment
15 represents financial harm to Plaintiff that in turn has produced financial benefit to
16 Stryker, all attributable to Stryker's unlawful business practices. This is all that is
17 needed to state a claim for restitution under section 17200.

18 Therefore, this asserted ground for dismissing the section 17200 claim fails,
19 as well.

### C. Plaintiff and the Class Are Entitled to Injunctive Relief Benefiting Private-Pay Patients.

22 Plaintiff's injunctive relief remedies are not barred because, as explained
23 above, she has alleged an injury in fact and causation connecting the injury to
24 Stryker's illegal kickback conspiracy. Styker next argues that because it is not
25 under regulation by the federal authorities, the Court should abstain from "granting"
26 injunctive relief. (Def. MP&A at 10:20-12:21.)

27 As alleged in the complaint, the federal monitoring of Stryker is focused on
28 the effects of Stryker's business practices on the public budget, and is of little if any

Kabateck Brown Kellner, LLP
644 S. Figueroa Street
Los Angeles, California 90017
(213) 217-5000
FAX (213) 217-5010

— 11 —

**Opposition to Motion to Dismiss (Case No: 08-cv-02443 JAS)**

benefit to private-pay patients like Plaintiff. (Complaint, ¶¶ 27-28.) Additional injunctive relief would not be "pointless," as Stryker asserts, for private-pay patients in California. In addition, Stryker's vague argument that whatever injunctive relief might eventually be ordered in the present case "might" "conflict and interfere" with federal officials' current oversight of Stryker pursuant to the Non Prosecution Agreement (Def. MP&A at 12:14-16) relies on a purely hypothetical and speculative premise that establishes no reasonable ground for striking the prayer for injunctive relief, much less dismissing the section 17200 claim, at the pleading stage.

More importantly, the Non Prosecution Agreement is set to expire after 18 months (see complaint, Exh. A at 1) – that is, in April 2009, a mere six months after the hearing on this motion. Thus, the basis for Stryker's abstention argument, thin as it already is, will be entirely gone before this litigation is resolved.

In sum, all Stryker's arguments for dismissing the section 17200 claim fails. The Court should deny the motion to dismiss in its entirety.

## VI. THE COMPLAINT SUFFICIENTLY ALLEGES PLAINTIFF'S MEMBERSHIP IN THE CLASS

Stryker's final mischaracterization of the complaint concerns Plaintiffs' membership in the class that she seeks to represent. Stryker makes the hyper-technical argument that Plaintiff fails to explicitly state that she is a private-pay plaintiff. (Def. MP&A at 13:3-6.) The complaint more than apprises Stryker of the fact that Plaintiff is a private-pay plaintiff, and thus, this argument should be rejected.

Paragraph 32 of the complaint states Plaintiff underwent right hip replacement surgery in June 2003 and left hip replacement in May 2005, during which times she was implanted with one or more Stryker products. (¶ 32.) Her out-of pocket expenditures for her hip surgery amounted to approximately $1,500 or more. (*Id*.) As a reasonable factual inference, this amount rules out the possibility

— 12 —

that she is an uninsured private-pay patient, since the total costs of hip replacement surgery are far more than $1,500. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2510 (2007) (the complaint must be read in its entirety; not in isolated parts).

Furthermore, the complaints also provides that "Plaintiff is a member of the class" (¶ 36), and that her "interests are coincident with . . . those of other members of the Class" (¶ 37).

Therefore, the allegations of the complaint sufficiently plead that Plaintiff is a member of the class that she seeks to represent: Californians with either private health insurance or no health insurance who paid at least a portion of the costs of hip or knee implant surgery, performed during the class period, that involved the use of Stryker implant products. Accordingly, the Court should reject the Stryker attack on the pleadings as to Plaintiff's standing to represent the class.

To the extent there is any ambiguity as to Plaintiff's membership in the class, it must be resolved in Plaintiff's favor. *See, e.g., Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).

## VII.  CONCLUSION

For the reasons discussed above, the Court should deny the Stryker Defendants' motion to dismiss. Alternatively, if the Court is inclined to grant the motion, Plaintiff respectfully requests leave to amend.

DATED:  July 7, 2008

By:  ___/s/_____
**KABATECK BROWN KELLNER LLP**
Brian S. Kabateck
Richard L. Kellner
Reza Sina
*Counsel for Plaintiff and the proposed class*